Filed 1/19/23  PharmBlue Cal. v. Dept. of Health Care Services CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PHARMBLUE CALIFORNIA LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DEPARTMENT OF HEALTH CARE SERVICES et al.,<br><br>    Defendants and Respondents. | B313600<br><br>Los Angeles County Super. Ct. No. 20STCP02262 |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

Athene Law, Long X. Do, Felicia Y. Sze, and Kyle R. Brierly for Plaintiff and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown, Bejan E. Atashkar, Neo Khuu, and Emmanuelle S. Soichet, Deputy Attorneys General, for Defendants and Respondents.

Hanson Bridgett and Kathryn E. Doi for Amicus Curiae Foothill Aids Project on behalf of Plaintiff and Appellant.

# INTRODUCTION

PharmBlue California LLC doing business as Arena Pharmacy (PharmBlue) contracted with two healthcare clinics that qualify as covered entities under the federal Medicaid program to dispense to the clinics' patients discounted drugs purchased under section 340B of the Public Health Services Act (340B Program) (42 U.S.C. § 256b). Under California law, a covered entity must bill the State's Medi-Cal program no more than the actual acquisition cost of drugs purchased through the 340B Program. After acquiring discounted 340B drugs for the clinics, PharmBlue billed Medi-Cal at the pharmacy's usual and customary rate for purchasing drugs, a rate that was higher than the actual acquisition cost of the 340B drugs. The California Department of Health Care Services (Department) later audited PharmBlue's billing practices, finding that PharmBlue was reimbursed nearly $2.5 million more than the pharmacy was entitled to receive for the 340B drugs.

After losing an administrative appeal of the Department's audit adjustment reducing its reimbursement for 340B drugs, PharmBlue filed a petition for writ of mandate in the trial court. The court denied the petition and entered judgment in the Department's favor, concluding PharmBlue overbilled the Medi-Cal program for its purchase of 340B drugs.

PharmBlue appeals the court's judgment, which we affirm.

2

## 1. Statutory and Regulatory Background

### 1.1. Medicaid and 340B Program

"The federal Medicaid program is a cooperative federal-state assistance program designed to expand access to medical care for low income persons." (*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2021) 71 Cal.App.5th 88, 92 (*Family Health Centers*).) Under the Medicaid program, "the federal government provides financial assistance to states so that they may furnish medical care to qualified indigent persons." (*Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 751.)

The 340B Program, which is tied to the Medicaid program, "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities" known as "covered entities." (*Astra USA, Inc. v. Santa Clara County* (2011) 563 U.S. 110, 113–114 (*Astra*); see also 42 U.S.C. § 256b.) Covered entities include federally-funded "providers of safety net services to the poor." (*Astra*, at p. 113.)

If a drug manufacturer is enrolled in the 340B Program, it must offer drugs "for purchase at or below the applicable ceiling price" to a covered entity "if such drug is made available to any other purchaser at any price." (42 U.S.C. § 256b(a).) The purpose of the 340B Program is to " 'stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.' " (*Pharm. Research & Mfrs. of Am. v. United States HHS* (D.D.C. 2015) 138 F.Supp.3d 31, 34.)

The 340B Program is administered by the Health Resources Services Administration (HRSA), a federal agency

within the Department of Health and Human Services. (*Astra, supra*, 563 U.S. at p. 113.) The HRSA has issued a series of guidelines interpreting the 340B Program. In 1996, the HRSA issued guidelines allowing covered entities to contract with outside pharmacies to receive shipments of 340B drugs, dispense those drugs to the covered entities' patients, and place orders to refill the covered entities' inventories of those drugs. (See Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 C.F.R. 43549 (Aug. 23, 1996).) In a published notice "inform[ing] interested parties of final guidelines regarding contract pharmacy services," the HRSA explained that a pharmacy that contracts with a covered entity under the 340B Program "act[s] as an agent of the covered entity, in that it would not resell a prescription drug but rather distribute the drug on behalf of the covered entity. This situation is akin to a covered entity having its own pharmacy." (*Id.*, p. 43550.)

In 2010, the HRSA issued additional guidelines defining a covered entity's relationship with an outside pharmacy under the 340B Program. (See Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 C.F.R. 10272 (Mar. 5, 2010).) Specifically, the HRSA required a covered entity to "have a written contract in place between itself and a specified pharmacy." (*Id.*, p. 10277.) The agency also identified several "essential elements to address in contract pharmacy arrangements," including requiring the covered entity to "purchase the [340B Drug] [and] maintain title to the drug" and to follow a " 'ship to, bill to' procedure [where] the covered entity purchases the drug[, and] the manufacturer/wholesaler [bills] the covered entity for the drug that it purchased[] but ships the drug

4

directly to the contract pharmacy." (*Ibid*.) The HRSA also provided suggested terms to be included in a contract between a covered entity and an outside pharmacy, including one that states: " 'The covered entity owns the covered drugs and arranges to be billed directly for such drugs. … The covered entity will make timely payments for such drugs delivered to the pharmacy." (*Id*., p. 10279.)

### 1.2. California's Medi-Cal Program

California participates in the Medicaid program through its California Medical Assistance Program, or the "Medi-Cal" program. (*Family Health Centers*, *supra*, 71 Cal.App.5th at p. 92; Welf. & Inst. Code, § 14000 et seq.) The Department is tasked with administering the Medi-Cal program "in compliance with the state Medicaid plan and applicable federal and state Medicaid laws and regulations." (*Family Health Centers*, at p. 92.) Federal law requires California to reimburse health care providers that participate in the Medi-Cal program for services they provide to qualified patients. (*Ibid*.; 42 U.S.C. § 1396a(bb).)

Business and Professions Code section 4126 permits covered entities to contract with outside pharmacies to provide services under the 340B Program. (Bus. & Prof. Code, § 4126, subd. (a).) That statute requires contracts between covered entities and outside pharmacies to comply with the HRSA's guidelines. (*Ibid*.) The statute also requires a contract pharmacy to segregate 340B drugs that it receives on a covered entity's behalf from the "pharmacy's other drug stock by either physical or electronic means." (*Id*., subd. (b).)

Welfare and Institutions Code[1] section 14105.46 governs, among other things, reimbursement for 340B drugs. Under that statute, a covered entity must bill the Medi-Cal program "an amount not to exceed the entity's actual acquisition cost for [a 340B drug], as charged by the manufacturer at a price consistent with Section 256b of Title 42 of the United States Code plus the professional fee pursuant to Section 14105.45 or the dispensing fee pursuant to Section 14132.01." (§ 14105.46, subd. (d).)

Section 14105.45 generally governs reimbursement for prescription and non-prescription drugs purchased by pharmacies. At all times relevant to this appeal, section 14105.45 allowed pharmacies to seek reimbursement from the Medi-Cal program at the lowest of "[t]he estimated acquisition cost of the drug plus a professional fee for dispensing" or "[t]he pharmacy's usual and customary charge as defined in section 14105.455." (See former § 14105.45, subds. (a)(7) & (b)(1); Stats. 2011, ch. 29 (A.B. 102), § 14, eff. June 29, 2011.) The version of section 14105.45 applicable here defined "estimated acquisition cost" as the Department's "best estimate of the price generally and currently paid by providers for a drug product sold by a particular manufacturer or principal labeler in a standard package." (Former § 14105.45, subd. (a)(4).) Section 14105.45 makes no reference to covered entities, 340B drugs, or the 340B Program.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

### 2. PharmBlue contracts with two covered entities to dispense 340B drugs to the covered entities' patients.

PharmBlue is a licensed retail pharmacy. The Foothill AIDS Project (Foothill) and the Sunburst Project (Sunburst) are federally funded HIV/AIDS clinics that qualify as covered entities under the 340B Program (collectively, Clinics).

The Clinics contracted with PharmBlue to provide pharmaceutical services under the 340B Program, such as dispensing medications to, and managing the medication plans for, the Clinics' patients. Each contract between PharmBlue and the Clinics includes similar terms, including a provision stating that it "is the intent of the Parties that this relationship shall be administered in accordance with applicable laws, regulation[s], and agency guidance governing the 340B Program."

Under its contracts with the Clinics, PharmBlue was required to obtain, on the Clinics' behalf, 340B drugs at discounted prices from various manufacturers.[2] The manufacturers would bill the Clinics for the purchase of the 340B drugs, while shipping the drugs directly to PharmBlue. Although PharmBlue paid the invoices and collected payments from patients who received 340B drugs, the Clinics "remain[ed] responsible for payment of manufacturer invoices." The contracts also required PharmBlue to segregate its inventory of 340B drugs from the rest of its drugs and dispense 340B drugs only to qualified patients holding prescriptions issued by the Clinics or a prescriber affiliated with the Clinics. The Clinics retained title to

---

[2] PharmBlue does not dispute that but for its contracts with the Clinics, it could not purchase discounted drugs through the 340B Program.

the 340B drugs even though PharmBlue purchased, stored, and dispensed them.

Under its arrangement with the Clinics, PharmBlue billed the Medi-Cal program for purchasing and distributing the Clinics' 340B drugs. For each 340B drug billed to the Medi-Cal program, PharmBlue charged its "usual and customary" rate, not the actual acquisition cost of the drug. As a result, the Department reimbursed PharmBlue at the maximum rate authorized under section 14105.45, not the drugs' actual acquisition cost under section 14105.46.

The Clinics retained PharmBlue's gross reimbursement from the Medi-Cal program, less the higher of 22 percent of the total monthly gross receipts from PharmBlue's distribution of 340B drugs or $10 each time PharmBlue dispensed 340B drugs.[3] According to the contracts, the parties agreed PharmBlue's compensation was "consistent with fair market value in arms-length transactions for Pharmacy Services."

3.    **The Audit and Administrative Challenge**

In September 2017, the Department audited PharmBlue's billing practices. The Department found that between May 2015 and March 2017, PharmBlue improperly billed Medi-Cal at its "usual and customary" rate for purchasing 340B drugs for the Clinics. PharmBlue, therefore, was reimbursed $2,438,813 more than it was entitled to receive had it billed the Medi-Cal program for the actual acquisition cost of the drugs as required by section 14105.46.

---

[3] At the administrative hearing in this case, PharmBlue's vice-president testified this arrangement benefitted the Clinics.

8

PharmBlue appealed the Department's audit finding to an administrative law judge (ALJ). After a formal hearing, the ALJ denied PharmBlue's appeal.

The ALJ found PharmBlue could purchase 340B drugs only because it contracted with the Clinics to purchase those drugs on their behalf. Thus, although PharmBlue wasn't a covered entity, it stood in the shoes of the Clinics when it bought 340B drugs and dispensed them to the Clinics' patients. Additionally, considering the HRSA's guidelines, the ALJ concluded PharmBlue was acting as the Clinics' agent for all purposes of the 340B Program, including billing the Medi-Cal program for purchasing and dispensing the Clinics' 340B drugs. Because PharmBlue stood in the Clinics' shoes and acted as their agent for all services related to the 340B Program, it was required to bill the Medi-Cal program at the actual acquisition cost of the 340B drugs under section 14105.46, rather than at PharmBlue's higher "usual and customary" rate that it charges for purchasing drugs on its own behalf. Thus, the ALJ concluded, PharmBlue overbilled the Medi-Cal program for the 340B drugs it purchased and dispensed for the Clinics.

### 4.     The Petition for Writ of Mandate

In October 2019, PharmBlue filed a petition for writ of mandate in the trial court,[4] challenging the ALJ's decision denying PharmBlue's appeal of the Department's audit finding. The court denied PharmBlue's petition.

---

[4] The petition named the Department and Richard Figueroa, in his capacity as the acting Director of the Department, as respondents. We collectively refer to respondents as "the Department" throughout this opinion.

First, the court found that under the terms of PharmBlue's contracts with the Clinics and the HRSA's guidelines, PharmBlue was the Clinics' agent and never owned the 340B drugs at issue in the Department's audit. Instead, PharmBlue purchased, stored, and dispensed those drugs on the Clinics' behalf. Without title to the 340B drugs, the court explained, PharmBlue "had no legal basis to seek reimbursement from Medi-Cal except as the [Clinics'] agent. Standing in the [Clinics'] shoes …, [PharmBlue] is limited to their reimbursement"—i.e., the actual acquisition cost of the 340B drugs, as required by section 14105.46.

Second, the court rejected PharmBlue's argument that section 14105.45 governed Medi-Cal reimbursement for 340B drugs purchased by contract pharmacies because only that statute, and not section 14105.46, refers to pharmacies. Although contract pharmacies are not named in section 14105.46, the court explained that excluding such entities from the statute's reach would lead to absurd results. For instance, excluding contract pharmacies from section 14105.46's reimbursement cap would create a loophole through which covered entities that contract with outside pharmacies could obtain more Medi-Cal reimbursement than covered entities using only their own pharmacies.

Finally, the court found the Department's interpretation of section 14105.46 as it applies to contract pharmacies was entitled to deference for several reasons. First, the application of the statutory scheme governing Medi-Cal reimbursement, including section 14105.46, is "technical and complex in that it intersects with and requires an understanding of a multitude of state and federal programs and is entwined with issues of policy." Second, applying section 14105.46 involves "issues of fact concerning the

340B program and Medi-Cal reimbursement for which [the Department] has expertise and technical knowledge." And third, the Department's requirement that contract pharmacies bill the Medi-Cal program at the actual acquisition cost of 340B drugs "has been in place since at least December 2003, which predates the enactment of section 14105.46 by several years."

After denying PharmBlue's petition, the court entered judgment in the Department's favor.

PharmBlue appeals.

## DISCUSSION

### 1. Standard of Review

We review the denial of a petition for writ of administrative mandate to determine whether the public agency committed a prejudicial abuse of discretion. (*Family Health Centers*, *supra*, 71 Cal.App.5th at p. 96.) An agency abuses its discretion if it has not proceeded in the manner required by law, its decision is not supported by the findings, or its findings are not supported by the evidence. (*Ibid*.)

In evaluating the sufficiency of the agency's findings, our job is the same as that of the trial court. (*Family Health Centers*, *supra*, 71 Cal.App.5th at pp. 96–97.) We review the entire administrative record to determine whether the agency's findings are supported by substantial evidence. (*Ibid*.; Code Civ. Proc., § 1094.5.) The agency's findings are entitled to a " 'strong presumption' " of correctness, so we must resolve all conflicts in favor of those findings. (*Family Health Centers*, at p. 97.) "If a finding is supported by substantial evidence, we may not disregard or overturn it merely because a contrary finding would have been equally or more reasonable." (*Ibid*.)

11

Where an issue turns on the interpretation of a statute or a regulation, it is a question of law that we review de novo. (*Redondo Beach Waterfront, LLC v. City of Redondo Beach* (2020) 51 Cal.App.5th 982, 993.) Although an agency's interpretation of the laws it enforces may be entitled to deference, we are "the ultimate arbiter of the interpretation of the law." (*Family Health Centers*, *supra*, 71 Cal.App.5th at p. 97.)

Because PharmBlue challenges the administrative law judge's decision upholding the Department's audit finding, it bears the burden of showing a prejudicial abuse of discretion. (*Family Health Centers*, *supra*, 71 Cal.App.5th at p. 97.)

**2.      PharmBlue is subject to section 14105.46's reimbursement cap for drugs purchased through the 340B Program.**

The key issue in this appeal is whether section 14105.46, subdivision (d)'s reimbursement cap for drugs purchased through the 340B Program applies to PharmBlue. As we explain, the ALJ correctly found PharmBlue is bound by section 14105.46.

Our primary task when interpreting a statute is to ascertain the Legislature's intent so that we can give effect to the law's purpose. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.) We start with the statute's words, which are usually the most reliable indicator of the legislative intent. (*Id*. at pp. 95–96.) The words of the statute should be given their ordinary and usual meaning and construed in their statutory context. (*Thornburg v. Superior Court* (2006) 138 Cal.App.4th 43, 49 (*Thornburg*).) The words should also be given the same meaning throughout the code unless it's clear the Legislature intended otherwise. (*Ibid*.)

We are not constrained by the plain meaning of the statute's words, however, if a literal construction is contrary to

the statute's apparent purpose or would lead to absurd results the Legislature could not have intended. (*Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1157 (*Busker*); *Thornburg*, *supra*, 138 Cal.App.4th at p. 49.) We should consider the statute's objective and context, the harms to be remedied by the statute, the history surrounding the statute's enactment, public policy, and contemporaneous construction. (*Thornburg*, at p. 49.)

Subdivision (d) of section 14105.46 provides that a "covered entity shall bill an amount not to exceed the entity's actual acquisition cost for the drug, as charged by the manufacturer at a price consistent with Section 256b of Title 42 of the United States Code plus the professional fee pursuant to Section 14105.45 or the dispensing fee pursuant to Section 14132.01." Under section 14105.46, subdivision (a)(1), a "covered entity" is "a provider defined as a covered entity in Section 256b of Title 42 of the United States Code." Neither section 14105.46 nor 42 U.S.C. section 256b expressly refers to pharmacies.

PharmBlue urges us to apply the plain language of section 14105.46. Since pharmacies are not mentioned in the statute, PharmBlue insists it cannot be bound by the statute's reimbursement cap for drugs purchased through the 340B Program. Instead, PharmBlue argues, all pharmacies, including those that contract with covered entities under the 340B Program, are subject to the reimbursement rules set forth in section 14105.45, subdivision (b), which expressly apply to pharmacies. (See § 14105.45, subd. (b)(1) [setting forth reimbursement rules for "Medi-Cal pharmacy providers"].) We reject PharmBlue's literal reading of section 14105.46 because it would defeat the statute's purpose, lead to absurd results, and defy principles of agency law.

13

First, PharmBlue's reading of section 14105.46 would undermine the statute's obvious purpose of limiting reimbursement for the purchase of discounted drugs through the 340B Program to the drugs' actual acquisition cost. That is, if section 14105.46 does not apply to contract pharmacies, a covered entity could circumvent the statute's reimbursement cap by contracting with an outside pharmacy to not only acquire, store, and dispense the covered entity's 340B drugs, but to also bill the Medi-Cal program at the higher rates authorized by section 14105.45, rates that would not be available to the covered entity had it billed Medi-Cal directly for its purchase of 340B drugs. Like the Clinics did in this case, the covered entity could arrange for the outside pharmacy to kick back the reimbursement the pharmacy received from billing the Medi-Cal program at the higher rates authorized by section 14105.45. Widespread use of the billing and compensation arrangements like those employed by PharmBlue and the Clinics could render section 14105.46's reimbursement cap toothless. (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274 ["Well-established canons of statutory construction preclude a construction which renders a part of a statute meaningless or inoperative."].)

Second, PharmBlue's interpretation of the statute would lead to an absurd result the Legislature did not intend. As we just explained, a covered entity contracting with an outside pharmacy could be reimbursed at rates higher than the cap imposed by section 14105.46. A covered entity using an in-house pharmacy, however, would be limited to the lower billing rates mandated by section 14105.46. In other words, a covered entity using an outside pharmacy could receive more money from the Medi-Cal program for purchasing the same drugs through the

14

340B Program than could a covered entity using an in-house pharmacy. But, as Foothill acknowledges in its amicus brief, it is more difficult and costly for a covered entity to establish and run an in-house pharmacy than it is to contract with an outside pharmacy. (See *Sanofi-Aventis U.S., LLC v. United States HHS* (D.N.J. 2021) 570 F.Supp.3d 129, 196–197, fn. 53.) PharmBlue cites no authority or evidence, and we are aware of none, that indicates the Legislature intended to treat covered entities contracting with outside pharmacies more favorably than covered entities using in-house pharmacies. (*Busker*, *supra*, 11 Cal.5th at p. 1157 [courts should avoid an absurd construction of a statute that the Legislature could not have intended].)

Third, applying agency principles, section 14105.46's reimbursement cap applies to PharmBlue. Civil Code section 2295 defines an agent as "one who represents another, called the principal, in dealings with third persons." The defining characteristic of an agency relationship is the "delegation of authority from the principal to the agent which permits the agent to act 'not only *for*, but *in the place of*, his principal' in dealings with third parties." (*Channel Lumber Co. v. Porter Simon* (2000) 78 Cal.App.4th 1222, 1227 (*Channel Lumber*).) An agency relationship may be formed through contract. (*Hoffmann v. Young* (2022) 13 Cal.5th 1257, 1274.)

Generally, an agent stands in the shoes of its principal and cannot do any acts that the principal is not qualified to perform. In other words, a principal "may not employ an agent to do that which the principal cannot do personally." (*Channel Lumber*, *supra*, 78 Cal.App.4th at p. 1228.) Further, where an agent voluntarily accepts the benefits of its transaction with the principal, the agent consents to all the obligations arising from

15

that transaction. (*Thornburg, supra,* 138 Cal.App.4th at p. 54; see Civ. Code, § 1589.)

Here, the terms of PharmBlue's contracts with the Clinics establish that the pharmacy was the Clinics' agent and assumed the Clinics' duties under the 340B Program. Each contract between PharmBlue and the Clinics includes a provision stating that the parties intended their relationship to be governed by "applicable laws, regulation[s], and agency guidance governing the 340B Program." Thus, PharmBlue and the Clinics expressly incorporated the HRSA's interpretive guidance on the 340B Program into their contracts.

The HRSA's guidance clearly supports a finding that PharmBlue acted as the Clinics' agent under the 340B Program. As we noted above, the HRSA defines contract pharmacies participating in the 340B Program as the "agent[s]" or "inhouse pharmac[ies]" of their associated covered entities. Other parts of the HRSA's guidelines are consistent with this characterization of the relationship between contract pharmacies and their associated covered entities. For instance, those guidelines prohibit a contract pharmacy from obtaining title to any 340B drugs it obtains on behalf of a covered entity. And a covered entity must ultimately remain responsible for paying manufacturers for 340B drugs, even when a contract pharmacy acquires, stores, and dispenses the drugs on the covered entity's behalf.

The other terms of PharmBlue's contracts with the Clinics also support a finding that PharmBlue acted as the Clinics' agent. Under those contracts, PharmBlue was required to acquire 340B drugs "on behalf of" the Clinics and maintain inventory levels sufficient to meet the demands of the Clinics' patients.

PharmBlue also agreed to dispense 340B drugs and provide various pharmaceutical services to the Clinics' patients. The Clinics also prohibited PharmBlue from distributing the 340B drugs to anyone who wasn't one of the Clinics' patients or didn't hold a qualifying prescription from a prescriber associated with the Clinics. And while the contracts provided that the Clinics remained responsible for paying the manufacturer's invoices, PharmBlue agreed to pay those invoices on the Clinics' behalf.

Since PharmBlue was the Clinics' agent under the 340B Program, PharmBlue could not achieve through that program what the Clinics could not. That is, the Clinics could not use PharmBlue to avoid section 14105.46's reimbursement cap for drugs it purchased on the Clinics' behalf. (*Channel Lumber*, *supra*, 78 Cal.App.4th at p. 1228 [a principal may not employ "an agent to do that which the principal cannot do personally"].)

Alternatively, PharmBlue was bound by the Clinics' billing obligations under the 340B Program once it accepted the benefits of its contract to act as the Clinics' agent for purposes of that program. Under the terms of their contracts, the Clinics compensated PharmBlue for the services it provided under the 340B Program at what the parties agreed was a rate "consistent with fair market value in arms-length transactions for Pharmacy Services." Thus, having benefitted from acting as the Clinics' pharmacy under the 340B Program, PharmBlue cannot avoid the Clinics' obligation to bill the Medi-Cal program at the actual acquisition cost of the 340B drugs that PharmBlue acquired and dispensed on the Clinics' behalf. (Civ. Code, § 1589; see also *Thornburg*, *supra*, 138 Cal.App.4th at p. 53 [an agent is bound by the principle's statutory obligations where the agent: (1) assumes

17

the statutory duties imposed on the principal; and (2) acts for its own benefit as well as for the benefit of its principal].)

## DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. The Department shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

NGUYEN, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18